Case of the day, we have Goauto Insurance Company v. 2B Claims Services, Inc., 24-13643. Mr. Burge, you obviously can get set up, but we're ready when you are. And I know that you have reserved some time for rebuttal. Yes, thank you, Your Honor. Jason Burge, representing the appellant here, Goauto Insurance Company. Goauto is an out-of-state insurance company that hired a Florida licensed adjuster to adjust a personal injury claim. 2B screwed up the assignment, resulting in an excess settlement. Nonetheless, the district court granted summary judgment in favor of 2B. This was an error, and the lengthy factual recitations in both parties' briefs, I think, demonstrate that there are many material facts in dispute here that should preclude summary judgment. Now, in its written order, the district court gave two reasons for granting summary judgment in favor of 2B, both of which were based on inappropriately resolving material factual disputes against Goauto. The first error was finding that no state court jury in Florida could have held Goauto liable. Now, this is an incredible finding, both as a matter of law and as a matter of fact. On the law, recall that the standard here is that the insurer must use, quote, the same degree of care and diligence as a person of ordinary care should exercise in the management of his own business, that this is measured on a factually intensive totality of the circumstances test. There is no reported case where coverage, liability, and excess damages were all almost immediately established, and the insurer waited four months to make any offer to any claimant, and a court still said the insurer couldn't be held liable for bad faith as a matter of law. In every case cited by 2B or the district court, you look at the Aras case, the Peleas case, the Valley case, the Martinez case, they submitted under 28J. The insurer tendered their whole policy within 30 days or approximately a month of the accident. No case has ever held that waiting four months to make any offer at all, much less allowing two separate time-limited demands to expire in the interim, is good faith as a matter of law. And this court, in the Moore decision, we also cited the Primo decision below, recognized this is a fact-based inquiry that's unsuitable for summary disposition in most cases. I'd also just notice on this first point, as a matter of fact, the district court's conclusion is just illogical. Go Auto, as an insurance company, has no incentive to pay $200,000 above our policy limits if we don't face bad faith liability. There was testimony in the record that Go Auto hired competent Florida counsel, and that competent Florida counsel testified that Go Auto was potentially subject to bad faith liability. You're focusing on whether or not you were required to settle or not, and whether a jury could reasonably find you had to settle. That's what you're focusing on, right? That was the first basis for the district court rule. I want to focus more on, because I couldn't find a case where an insurance company was suing an adjuster for anything like this. Sure, I think we cited two. So what two cases would you say where somebody is suing an adjuster that are relevant here? Yeah, we had two, I think. One was the home insurance company case. It was a case from the Florida Supreme Court, no, excuse me, from the Florida 4th District Court, which was an insurer suing an adjuster, and they were held responsible for negligence. We also cited the GAB Business Services case, which was an 11th Circuit case from 1987. Those were both cases where an insurer sued the adjuster because he had— But neither one of them had to do with excess liability, though. Well, I think in both cases, the argument made by the insurer was, you screwed up the adjustment, you cost me money that I wouldn't have had to spend on. That's not what I asked. None of them had to do with an insurer later paying above policy limits because of a bad faith claim. Neither one of them had this sort of case-within-case aspect. Okay, so let me go to this. What is the duty, because I don't understand an adjuster's duty, to give legal advice about you need to pay? What is your best case that they've got to give the adjuster? Because they're not lawyers, right? Sure. The adjuster's not a lawyer. The adjuster wasn't a lawyer, right? Correct, they were not a lawyer. And your client knew the adjuster was not a lawyer, right? That's correct. Okay. And your client actually talked to a lawyer during the course of this. We don't know what you asked the lawyer. Apparently, it was about the other claim. Correct. The harm claim. So you were talking to a lawyer saying, we've got this other claim, what we should do. We don't know what the conversation was. I mean, it's all in the record exactly what we know about that. Okay, okay. But your client, independent of this adjuster, went and called its lawyer to get legal advice. Well, only because we got completely inconsistent advice from this adjuster. First, they told us they can't send a 10-day letter. Then they said they recommended we send a 10-day letter, and we were like, this is inconsistent. But that's not what caused the problem here. What caused the problem here was the lack of your client sending the certified checks. You knew you could resolve this case, the underlying claim, if you sent the checks, right? We knew that they had made a settlement offer, and we discovered approximately two business days before it was due. And you knew that they were consisting on checks coming with the acceptance of the offer. We knew that was the offer. But the adjuster did not keep you from doing that or anything, sending the checks. Oh, I disagree with that completely, Your Honor. Well, let's go to you. You knew you had the offer, and you knew the offer was contingent on the checks, right? Correct. All right. And you replied, we'll accept the offer, but here are the release. We won't send the checks until you sign the release. That's what happened. Because that was what to be instructed us to do. Well, we're going to get to that in a minute.  Okay. But you agree what fell apart was that you knew about the offer, and you knew the plaintiffs were requiring the checks. We knew that that's what they asked for. Okay. And you knew it could be settled, and you decided to do the release because that was your standard policy. You didn't send checks until you had releases. I think the testimony is we would send checks without releases. And, in fact, we did send checks in this case without releases. But at the time this all happened, you refused to send the checks without the releases, right? No, our adjuster specifically told us to send a policy limit. And with the policy limit offer, we sent releases, which is standard because that's what they asked us to send. Your adjuster didn't say, don't send the checks that they're demanding. Well, I disagree with that. I think the specific statement from the adjuster was we have documented what we can do, and if they want to be hard-nosed, that's up to them. But that's all it is. That doesn't say anything about the checks. That doesn't say anything. It doesn't reference releases, saying we've done what we can do. This is their offer. We've done what they do. He doesn't say, the adjuster doesn't say anything about not sending the checks. Well, what we know is that the adjuster that same day, or actually the day before, had requested authority to settle the claim. Which, by the way, that was one of their duties under this assignment. If you look from the very beginning, from Go Auto's instructions to their initial assignment memo. Did you ever ask the adjuster anything about bad faith liability? I couldn't find what you asked them anything about to give you an opinion about bad faith. I don't think we asked anybody about bad faith liability. No, so you never asked the adjuster about that. We asked them what we were required to do to complete the adjustment. And we asked, is there anything else we have to do? And they said no. I'm not sure that's accurate, what the record says. All the adjuster says is that they're playing hard-nosed and I don't know what else we can do about that. He's talking about the plaintiff's insistence on the checks. Clearly he's saying, they want the checks. There's nothing we can do. They're insisting on the checks. Seems like he was telling you, they're insisting on the checks. I think that's making a factual inference that the jury should get to make, Your Honor. I don't think that's the only way to read that. I think you can read that as them saying, we told you what you need to do is to send policy limits offers. If they want to be hard-nosed, there's nothing else we can do. You've answered my questions. Go back to your argument because I don't see how the causation is here at all. But go ahead. Well, I think part of the problem here is that everything is analyzed in terms of duty and whether there could be bad faith liability. But at the end of the day, causation, I think, is what's underlying all this. And causation is a factual issue. Proximate cause is almost the definition of a factual issue that should go to a jury if there are facts from which you could find causation. I think if you— You have to have a duty before you have causation. And part of the argument here is there's no duty to give you legal advice about bad faith. But I don't think it's legal advice. I think it's about proper adjusting techniques. I think this is the point at the end of the day. When you hire an adjuster, you expect the adjuster to tell you how you need to adjust the claim. When you hire an accountant, you expect the accountant to tell you how you have to file your taxes. I don't think you expect the adjuster to tell you about bad faith and legal liability under Georgia law if you don't send the checks. Well, it's not Georgia law. It's Florida law. Well, Florida law, excuse me. And we don't have any knowledge about Florida law. We expect them to tell us what proper Florida law— No, you've got a Florida lawyer you were talking to. You could have asked the Florida lawyer about it. Well, we didn't even hire him. This was a call made out of the blue. There was literally no testimony from that lawyer. I don't even believe there's any evidence he was ever paid anything. We didn't hire a Florida lawyer. I don't care whether you pay your lawyers or not. You called him and got advice about the other claim. Correct, but not about this one. Yes, but you could have gotten advice. Sure, there are other things they could have done. But what actually happened here is I think you—part of the flaw here I think is that we are so narrowed in on this one moment. And I think in that moment, there are enough facts around that moment that a jury could find that 2B is responsible for them not sending the checks. But, you know, and you said you knew two days beforehand. And I guess that begs the question of why, if you knew there was a requirement for checks in hand at least two days beforehand, why you couldn't have gone ahead and expressed the checks. But I think it's more than two days, so I'm not conceding two days, because on December 3rd, that was when 2B first forwarded to you the email from the Lacey's attorney with the check in hand by December 14th requirement. I know you sought an extension, and there may have been some ambiguity about what extension was given. But there's an internal Go Auto note from December 10th that says, 2B informed Go Auto on a phone call that the Lacey's attorney was demanding checks in hand by December 14th. Yeah, that's the two business days, Your Honor. That's a Thursday and the 14th is Monday. Okay, but still, there is an express way to get checks to people. Sure, but on that same day on December 10th, 2B, which was responsible for making a request for authority, asked for authority to send policy limits offers. They did not ask for authority to send checks. Had they asked for authority to send checks, we would have sent checks. We were relying on 2B as we had the entire adjustment to adjust the claim, make a request for authority, and settle the claims. That's in the original scope of their services. That's in the guidelines for how they handle our claims. And there were multiple breaches by 2B before this that sort of led to this difficult situation. We would not have been in this situation if they had gotten us the offer on November 25th that they received, that they were not monitoring their terminated employee's email because that offer didn't even require checks in hand. We wouldn't have been rushing at the last moment trying to figure out what to do with two business days and calling lawyers out of the blue if they had sent the 10-day demand letter back in November when we suggested it and when they told us we couldn't send a 10-day demand letter. That would be the ordinary course of adjustment. Ninety days had gone by and they had done nothing to actually make offers to any of these people. They needed to opt a lot faster. Mr. Kloros was deposed, correct? Which one? Mr. Kloros. Mr. Kloros, yes, the adjustment. He was deposed and the record to me only had a few pages of his deposition. You submitted it in a few pages. Your opponent submitted it. Was his full deposition filed in the district court and we just didn't get it? I don't believe so. I believe only the excerpts were filed by both sides. I know that in our court, but I'm asking in the district court. You have the full extent of everything that was submitted to the district court. You're saying the parties didn't file the full deposition in the district court. I do not believe so, no. Okay. But if you zoom out all the way, what happened here in this adjustment is that to be represented, that it could handle Florida claims, but it assigned an adjuster who had no experience adjusting Florida claims who failed to do any of the things that were required to do to adjust the claims. I think the bad faith is baked in long before you get to decide. The reason you had to pay the excess is because you didn't send the checks. Isn't that correct? That was what the plaintiff said. That was their grounds for the excess. We made an offer. You didn't send the checks. That was the basis for the excess liability according to the plaintiff. As a matter of but-for causation, if we had settled the claim on December 14th, we would not have had to pay excess. But I think the— If you'd sent the checks on December, timely, you wouldn't have had to pay excess. Because the claim would have been settled. Yes, and you knew that they were requiring checks to be sent to settle. We knew that that was their settlement demand. Demand, okay. Thank you. Are you bound—one question for me before you end. Are you bound by your concession at the summary judgment hearing that you have to prove your own bad faith to succeed on your claim? I don't think we have to prove our own bad faith. I think we do have to prove that we were subjected to potential bad faith liability. But I think we did prove that there was a potential for bad faith liability. But I want to make sure I understand the record. Did you say at summary judgment that—I don't know if it was you or whoever— that you had to prove your own bad faith in order to succeed? I don't think that's a fair reading of the argument if you go back and look at it. I'd have to go back and look at the exact quote. I think I certainly said that the fact that we were subject to bad faith liability is part of the causation here. But I don't think the idea here is that there would be a trial within a trial where the jury would first determine whether we were subject to bad faith liability and then determine whether to be headed duty or causation. I think if we can prove that we had a good faith belief that we were subject to bad faith liability and that we were exposed to that and that's why we settled, that would be sufficient. Here's what you said at the hearing. The key event was when it failed to deliver the checks because that's when the bad faith claim accrued. Okay? You pretty much say at the hearing, the failure to deliver the checks. They don't get the checks, there's a bad faith claim. So as a matter of causation, if they don't get the checks, there's a bad faith claim. You've told us that if you don't deliver the checks, we wouldn't be here. I mean, that's what you were telling the district court. It's all about the delivery of the checks. And I think a reasonable jury could find that we did not deliver the checks because— So basically you're saying that you didn't deliver the checks because the adjuster told you not to do the checks.  Okay. And on that, you rely on that one statement, they're being hard-nosed and there's not any more we can do. No, Your Honor. We also rely on their request for authority. They had an obligation to tell us what authority they needed to settle the claim. They made a request for authority. It's in the record on that day, December 10th, and they only asked for authority to make a policy limits offer. They did not ask for authority to deliver checks. Okay, but then after that, you knew that the checks were the— They knew the checks were there when they made the request. I'm not talking about what they knew. Okay. Sure. So you don't settle a claim unless adjuster asked for authority to settle the claim? Under Louisiana law, there's no obligation to settle the claim. Nobody referred to Louisiana law in the district court. Nobody talked about Louisiana law in the district court, did they? No, but I'm talking about the knowledge our adjuster had. He was a Louisiana adjuster. He was not a Florida adjuster. I know, but you didn't argue about Louisiana law and his knowledge in the district court. Oh, I believe I definitely argued that the distinction between what is required under Louisiana to avoid vaccines in Florida—  In the district court, for sure. Okay, thank you. It's definitely in there. See, I'm way over my time unless there are further questions. Thank you. You have time for a rebuttal. Mr. Franz? May it please the Court, Kevin Franz on behalf of 2B Claim Services. This court should affirm for both of the independent reasons given by the trial court and for three additional independent reasons being there's no duty, no breach, and critically, no excess judgment. So, as to the no causation, there's no evidence that 2B caused Gowada to do anything, let alone act in bad faith. Below, during the summary judgment hearing, counsel said if the checks had been delivered on 12-14, there would have been no bad faith. That's my case. So, that is really the only thing that we're concerned with here. It is undisputed, and I take issue with what counsel said. I think he misrepresented something. It's undisputed that 2B told Gowada on December 3rd and December 10th that Mr. McFadder, quote, has to have physically received the checks in their office by 12-14. So, this was told to him 11 days. Where are we going to find that? That'll be in the summary judgment hearing that was our supplemental appendix. I know that's what they said. Oh, I'm sorry. That physically received. That's if the checks have been delivered, there'd be no bad faith. That's that, but I'm talking about 12-3 and 12-10. That 2B is telling them the checks have to be physically received. Yes, I don't have the exact cite number, but in the statement of my case and facts, I have that quoted along with the citation. And then, additionally, Gowada consulted with the Florida bad faith attorney, Rob Squire, also on December 3rd and December 10th. And he basically—actually, I'll tell the court exactly what he said. Robert Squire, quote, advised that we are doing due diligence as outlined in good faith to make attempts to settle all claims, not just one claim, all claims. If no response, we will have no other choice but to address the filed claims. That was on December 3rd. And that's actually in the record at 25-3, page 34. And then on December 10th, he said, quote, Robert Squire, quote, advised that we are doing our absolute due diligence on claimant Hamer. He goes on to say, he stated that we have done everything we can do to resolve cases and protect insured. They say that's all about just the Hamer claim, not this claim. Well, the key is that he said cases. And in the previous one, he said all claims. And then he said if no response, we will have no other choice but to address the filed claims. So, another key thing is that Gowada never, not one time, ever asked to be, hey, can you provide us Florida bad faith legal advice? And that was never asked. And, of course, there was never an answer that said, yes, we can provide you Florida bad faith legal advice. Gowada also admits that it could have complied with the 12-14 deadline. That testimony is in the record, and I quote it in the initial brief. But what happened was, even though Gowada knew that they had to send the checks first, what Gowada did was said, you know what, I don't want to do that. I want the releases first. So you, 2B, go back to Mr. McFadden and say, okay, we'll make this offer to you, but first you need to have the signed releases sent back to us. And Mr. McFadden rejected that. So district court was right that no reasonable jury could find that 2B somehow caused Gowada to not deliver the checks by 12-14, especially when there was this counteroffer. And Your Honors asked whether there was any case that was presented where somehow an insurance adjuster is liable against an insurer. And, in fact, Judge Windsor asked this question. He said, he asked or he stated whether there was any authority holding that, quote, an adjuster or TPA or anyone in that universe has been held to have a duty to advise an insurance company about bad faith liability. There were no cases presented below on that, and there were no cases presented on appeal, and Gowada even conceded below that it had a non-delegable duty to protect the insured from an excess judgment. Not an adjuster in this case. I do want to talk about a really key factor that is kind of separate, but it is another grounds that we raise and that can be done to affirm this case, and that's the fact that there is no excess judgment. In the Martinez case that we filed as supplemental legal authority from this court, to prevail on a bad faith claim, a plaintiff must prove bad faith conduct by the insurer, which, too, causes an excess judgment to be entered against the insured. We argued this at Section 1C in our answer brief that this court should affirm because there can be no obligation to pay extra contractual damages if there is no extra contractual judgment. The plaintiff, Gowada, comes back with the GAB case, which says, they're arguing that there was a settlement in our case and that it was sufficient, the settlement is sufficient, you don't need an excess judgment. And what the GAB case said is demonstration of actual as opposed to potential liability is only necessary where the indemnity neglects to give the indented or an opportunity to review, pass upon, or participate in the settlement. So what they argue— Cases are between the insurer and the insured. They're not cases against the adjuster. Right, but— There's no obligation to pay until you get an excess judgment against the insured. Right, there has to be an excess judgment against the insured, which there is. Yeah, but those cases are all between the insurer and their own insured. Right, and the point is, without an excess judgment, not only can the insurer auto not be held liable for bad faith, but certainly someone lower on the rung. Okay, I see your point then. So— But don't—and the Gray brief doesn't go auto address this argument about the settlement and whether or not it had an opportunity to participate in it. Well, that's the key. That is the problem, that there is a misrepresentation. So Go Auto says in that brief, in March 2022, March 2022, quote, it called 2B to advise of potential settlement with the Lacy's and to give 2B the opportunity to participate in the settlement. And they cite to the appendix 25-3, page 14 through 16. There is nothing in there about giving 2B any opportunity to participate in the settlement. It mentions that there was a call to 2B, period, the end. Nothing about participating in the settlement. But here's what the record does show happened. On November 5, 2021, 2B's claims notes say, quote, received email from client advising to have no further activity on the file due to pending litigation. That's in appendix 25-2, page 141. Then Go Auto's attorney, Mr. Leiter, settled with the Lacy's on July 14, 2022. Absolutely no mention of 2B having any right to participate whatsoever. And that's on page 25-3, page 14. Then two months later, in September of 2022, Go Auto writes a letter to 2B that says, quote, Go Auto withdrew the handling of the claim from 2B and retained legal counsel due to the bad faith claims. Go Auto ultimately had to settle the claims of Mr. and Mrs. Lacy for a total of $250,000. And that's in appendix 25-2, page 43 to 44. Then the first time that 2B was even discussed about whether this settlement happened during this litigation on June 12, 2024, during deposition when Kurt Hankowski was asked, do you think the settlement amount was reasonable? So the record belies what they say in their brief. There is no evidence that we had any opportunity whatsoever. Without that evidence and without an excess judgment, this court can affirm based on that alone. And now I don't know whether they tried to save this, but they issued a footnote on page 24 of their brief that says these facts are underdeveloped in the record, but if they are disputed, that would preclude summary judgment. We raised this argument in our summary judgment motion. The time to dispute it was in the response. This has been waived. And under Martinez and Pereira, this court should affirm because there is no excess summary judgment. As to the duty and the breach, I think this court recognizes that there is no duty for an adjuster who is not an attorney to advise on bad faith law. There is no contract between these parties. They tried to say that there is an implied fiduciary relationship, but that cannot possibly exist because for that you cannot unilaterally, this is under the SUSMAR case from Florida 3rd DCA 2023, you cannot unilaterally impose a fiduciary responsibility on another simply by reposing trust. Absent some conscious acceptance of such duties, there is no fiduciary relationship. So they would have had to say, hey, 2B, I know you're just an adjuster and you have no legal experience, but can you please advise us on bad faith Florida law? Then 2B would have had to say, yes, we can advise you. There is, of course, no evidence in the record on that. So you're suggesting there is no fiduciary duty in the relationship as it existed, but Go Auto could have asked 2B to perform certain duties such that a fiduciary duty might have arisen. As to providing legal advices, the only way would be can you provide us legal advice, which of course they would say we are not bad faith attorneys. You should go contact a Florida bad faith attorney. And guess what? That's exactly what they did. They contacted a Florida bad faith attorney 11 days before they had to send the checks in hand, and they could have done that. So you're suggesting that there is no way really that there is a fiduciary relationship created between an insurance company and an adjuster? Not to provide Florida bad faith legal advice. Is there a fiduciary duty that exists between the insurance company and the adjuster otherwise? Not a fiduciary duty, but just what's agreed to by what they hired them to do, which in this case is the assignment was to speak with all involved parties, obtain third party vehicle appraisal, and handle any property damage and BI exposures. That's really the extent of it. And anything else would have been task related, but that didn't occur here. But they've also alleged negligent misrepresentation, and they've given us the statements that they claim are negligent misrepresentations. What are your response to their characterization of those statements as such? So the only pled claim in the complaint, which negligent misrepresentation sounds in fraud, it's under 9B, has to be pled with more particularity. Here's the only thing they say. To be misrepresented in material effect that failing to comply with the terms of Mr. McFadder's demand would expose Go Auto to risk of bad faith liability. Of course, there was no misrepresentation about that at all. Certainly there's no evidence that 2B somehow intended Go Auto to not comply with that. And then Go Auto would have had to justifiably rely on this misrepresentation. But, of course, they could not justifiably rely because what did they do? They did the right thing. They called Mr. Squire and they said, you know, are we doing everything that's copacetic? Are we complying with good faith? He even mentioned good faith in the part of the record where his discussion was noted. I thought that was all about the other case, the other claim. Well, they contacted him after this latest demand. I see. So the demand, 2B informed Go Auto on December 3rd that, hey, you have to have checks in hand. That same day Go Auto called Mr. Squire and he said, we are doing due diligence as outlined in good faith to make attempts to settle all claims, all claims encompasses all claims. If no response, we will have no other choice but to address the filed claims. So, Your Honors, both of the independent reasons given by the trial court should be affirmed and the three additional independent reasons that I suggested, it should be affirmed as well. If there are no other questions, I'll sit down. Thank you, Mr. Frantz. Thank you. Mr. Birch, you have three minutes. Yes, thank you, Your Honors. I want to start, Judge Branch, because I think my brother, Counsel, failed to answer the two questions you asked about fiduciary duty and negligent misrepresentation. I think it is unquestionably under Florida law, and we cited several cases, a factual determination whether there is a fiduciary duty. I think under the evidence here, where there is evidence that the adjuster for 2B thought that they were handling this as if they were an in-house adjuster, they were handling every aspect of the adjustment, the original assignment is much broader than even what my brother, Counsel, cited there. I think you could certainly find a fiduciary duty under these facts. And I think on the negligent misrepresentation, you asked specifically about his opinion on the negligent misrepresentations, and he dodged the two misrepresentations that are specifically cited in paragraphs 16 and 19 of our complaint. We give the exact quote the time it was given, and both of those statements are just unquestionably false. The very first one that was given on the 11th, the idea that if they want to be hard-nosed, there's nothing else we could do, that's just false. There is certainly something else they could have done. They could have delivered the checks. And on the 18th, when he comes back and he says, is there anything else we need to do, and they say, we've done everything we need to do, that's also false. And so those are two misstatements, and under section 552 of the restatement, when you make a statement in the course of your business services, you have an obligation to ensure it is correct. There is a duty there created for negligent misrepresentations. On the attorney question, I know we've gone back and forth about whether they were asking about the Hamer or the Lacey claim. I think the judge made a finding on that. If you look in the opinion, he specifically finds that they contacted the attorney only to talk about the third-party claim. If you take a look at the two quotes that are in the Go Auto Claims notes, they only reference Hamer in those quotes. They do not reference the Lacey claim at all, and that's consistent with the district judge's findings. So he did not credit their theory that we had gotten advice separately from the attorney rather than from 2B. And finally, I think it is, at the end of the day, the question here is whether there is a factual dispute that should go and should be determined by a jury. And I think on both duty, where you have factual issues about fiduciary duty and just about sort of general negligence and negligent misrepresentation, I think the court below found breach. If you look in his opinion, he has a specific footnote where he says Go Auto has plausibly pled that they breached their contractual obligations. So we've got duty, we've got breach, at least that there is a factual issue there. And I think in this situation, the idea that there could be no bad faith on these facts is just wildly implausible. This is not a situation where you have a collusive settlement between an insured and a third-party claimant, and they're just going to go after the insurance company. We paid $200,000 out of our own pocket. We would never have done that if we didn't think we faced real liability for a much larger judgment if we went forward. And so for all those reasons, I think there are factual issues here that should not have been resolved on summary judgment. The question is not whether Go Auto is ultimately going to win this case. The question is whether there are factual issues that should go to a jury not have been resolved by the district judge. And here I think there unquestionably were. Thank you, Mr. Burge. Thank you both. We have your case under advisement, and we are in recess until tomorrow morning.